**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEWYORK**
_____X

**UNITED STATES OF AMERICA,**



                    **-v.-**

                                                    **No. 1:23- Cr. 00496 (KPF)**
                                                    **ECF Case**


**CHRISTOPHER SALAMONE,**


                            **Defendant.**
_____X




## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT
## CHRISTOPHER SALAMONE













**THE PASCARELLA LAW FIRM, PLLC**
**By:  James Adam Pascarella**
***Attorneys for Defendant Christopher Salamone***
**1551 FRANKLIN AVENUE**
**MINEOLA, NEW YORK 11501**
**Tel.:  (516) 741-3476**
**Email:  jamespascarella@pascarellalawfirm.com**

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iii

Introduction .......................................................................... 1

Preliminary Statement ............................................................. 3

History And Characteristics Of Christopher Salamone ...................................... 9

Bases for Variance ................................................................. 13

Subpart A ........................................................................... 13

Subpart B ........................................................................... 13

Subpart C ...........................................................................15

Subpart D ........................................................................... 16

Conclusion .......................................................................... 18

## TABLE OF AUTHORITIES

**Cases:**                                                                    **Page**

*Cunningham v. California*, 549 U.S. 270 (2007) ........................................................ 7

*Gall v. United* States,128 S. Ct. 586 (2007) .................................................... 1, 5, 9

*Kimbrough v. United States*, 128 S. Ct. 558 (2007) ............................ 4, 5, 6, 7, 8

*Koon v. United States*, 518 U.S. 81 (1996) ......................................................... 1, 9

*Nelson v. United States*, 129 S. Ct. 890 (2009) .................................................... 4, 5

*Pepper v. United States,* 562 U.S. 476 (2011) ......................................................... 8

*Rita v. United States*, 127 S. Ct. 2456 (2007) .............................................. 4, 5, 6, 7, 8

*Spears v. United States*, 129 S. Ct. 840 (2009) .............................................   4, 5, 7

*United States v. Booker*, 543 U.S. 220 (2005) ........................................ 4, 5, 10, 15

*United States v. Carr*, 557 F.3d 93, 106 (2d Cir. 2009) ........................................ 8

*United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2009) ................................... 8

*United States v. Jones,* 531 F.3d 163 (2d Cir. 2008) .............................................. 8

*United States v. Lucania*, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005)................. 15

*United States v. Ministro-*Tapia, 470 F.3d 137 (2d Cir. 2006) ............................. 2

*United States v.* Parris, 573 F.3d 744 (E.D.N.Y. 2008) .......................................... 8

*United States v. Sanchez*, 527 F.3d 651 (2d Cir. 2008) ......................................... 8

*United States v. Seval*, Slip Op. 2008 WL 4376826 (2d Cir. 2008) ...................... 8

*United States v.* Taylor, 2008 WL 2332314 (S.D.N.Y. 2008) ................................ 8


**Statutes:**

18 U.S.C. § 3553(a)........................................................................................…… *passim*

**Page**

18 U.S.C. § 3559(a).................................................................................. 10

18 U.S.C § 3561(a)................................................................................... .10

18 U.S.C. § 994(h).................................................................................. 8

18 U.S.C. § 994(j).................................................................................. 16


**Miscellaneous:**

Hofer, Paul j., *Immediate and Long-Term Effects of United States v. Booker*, 38 Ariz. L. Rev. 425 ........................................................... 9

Hofer, Paul J., *The Reset Solution,* 20 Fed. Sent'g. Rep. 349 (2008) ....................... 9

Tonry, Michael, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research (2006) ........................................................ 17

*Sentencing Commission, Adopted Amendments to the Guidelines* (Nov. 1, 2018) ............................................................................ 11

U.S.S.C., *Alternative Sentencing in the Federal Criminal Justice System,* at 2-3............................................................................................ 11

U.S.S.C., *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 28 (2004)....................................... 16

Weissburd, David, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995)............................ 16

## INTRODUCTION

"It has been uniform and constant in federal judicial tradition for the sentencing Judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall v. United States,* 128 S. Ct. 586, 598 (2007), quoting *Koon v. United States,* 518 U.S. 81, 113 (1996).  On August 20, 2024, this Court will have the difficult responsibility of imposing sentence on Christopher Salamone, who, despite the narrowly-defined violation of law to which he has pled guilty, is an exceptional human being.  With great respect for the independence and integrity of this Court, counsel for Mr. Salamone submits this Sentencing Memorandum in the hope that it will be of value to Your Honor in fashioning an appropriate sentence.  It is respectfully submitted that beyond the admitted violation of 15 U.S.C.78j(b) and 78ff and 17C.F.R. 240.10b-5 and 18 U.S.C. 1348  and *pro forma* calculations made in accordance with the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the totality of Christopher Salamone as a person should be considered, as well.  Once due consideration is made, it is further submitted, it becomes apparent that the Guidelines calculation and consequent sentencing range set forth in the Plea Agreement is more severe than justice requires in this case.  Fortunately,

there is a reasonable alternative—a non-Guidelines sentence.  Such a

sentence, it will be demonstrated, is sufficient to satisfy the purposes of 18

U.S.C. § 3553(a), and, so, consistent with the parsimony clause thereof, the

aforesaid severe Guidelines sentence cannot be imposed.  *United States v.*

*MinistroTapia*, 470 F.3d 137 (2d Cir. 2006).

This Memorandum will be dedicated to presenting a more complete

picture of Christopher Salamone, seeking a sentence that is not "greater than

necessary" and establishing why a sentence that is a variance from the

Guidelines sentencing range, to wit: a sentence of 18 to 24 months is

appropriate under the law and the circumstances.  (In fact, respectfully, based

on the Sentencing Reform Act, past practice, empirical research and certain

United States Supreme Court and Second Circuit Court of Appeals decisions,

the first question in most cases in which a prison term is *not statutorily*

*required* should be whether probation will suffice, not how long the defendant

should be imprisoned).  It is also of worth that the probation report

recommends a sentence of "Time Served (Pursuant to 18USC 3553(a) and

5K1.1)" and a period of "Supervised Release" for "Counts 1-4" "1 year, with

each term to run concurrently"  (Probation Department's Presentence

Investigation Report ("PSR"), at page 30).

2

One practical way to "get to know" Christopher is to learn what others know, think, feel, believe and say about him.  To that end, various and numerous letters are submitted herewith, collectively, as Exhibit A, which is annexed hereto and made a part hereof.  These letters are from persons who have known Christopher for a period of time ranging from a few years to a lifetime.  Hopefully, they will shed sufficient light on the type of person he is, for they show Christopher as caring and compassionate, giving and charitable, trustworthy, honest, extremely hard-working, devoted to family, loyal and a valuable contributing member of his community, and on and on.  Counsel can say that, after representing him for over a year and spending countless hours in investigating this case and preparing with Chris for meetings with the government and for sentencing, I have come to know him, and to truly know him is to appreciate how extraordinary a person Chris is.[1]

## PRELIMINARY STATEMENT

On September 21, 2023, Christopher Salamone pled guilty, pursuant to a Plea Agreement, to a violation of 18 U.S.C. § 371, and three counts of Securities Fraud in violation of 15 U.S.C. 78j(b) and 78ff; 17CFR 240.10b; and 18U.S.C. 2.

---

[1] It could be said that this may be considered vouching for counsel's client. It must be said that it is *extremely* unusual for this counsel to make such a statement in the course of a submission on sentencing.

While that violation involved Chris, his case actually arose out of an investigation of his step brother, Anthony Viggiano.

The Plea and Cooperation Agreement, executed in court by Christopher on September 21, 2023, contains a Guidelines calculation that results in an Offense Level of 15 and a Criminal History Level of I (based on "0" points). This, according to the Sentencing Table, brings us to a Guidelines sentence range of 18 to 24 months.  The aforesaid Guidelines range calculation is confirmed in the Probation Department's PSR, at page 30.

Starting with its decision in *United States v. Booker,* 543 U.S. 220 (2005), which, among other things, made the Guidelines advisory rather than mandatory in nature, the Supreme Court of the United States has revitalized our system of sentencing, making it more just, fair and realistic, by giving district court judges the power to impose sentences that are not greater than necessary to satisfy the statutory purposes of sentences, to consider all of the characteristics of a defendant and circumstances of the offense, to reject the advisory Guidelines and to serve their function in the constructive evolution of responsible sentencing guidelines.  *See, Rita v. United States*, 127 S. Ct. 2456 (2007).  *See, also*, *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).  The Supreme Court appears to have gone out of its way to emphasize the foregoing by its decisions in *Spears v. United States*, 129 S. Ct. 840 (2009) and

4

*Nelson v. United States*, 129 S. Ct. 890 (2009).  Obviously, the Supreme Court

was getting the message across that sentencing was still too Guidelines-

centric.  *Booker* and its progeny changed the sentencing process and rid

judges of the shackles of the formulaic application of the Guidelines that

existed pre-*Booker* and which improperly confined the judge's ability to

consider the human being behind the offense.  The Supreme Court has made it

clear that the district courts must make an *individualized* assessment based on

all the 18 U.S.C. § 3553(a) factors and that virtually no area of mitigation is off

limits.  Indeed, in *Nelson, supra,* in key language, the Court said (citations

edited):

> Our cases do not allow a sentencing court to presume that a
> sentence within the applicable Guidelines range is reasonable.  In
> <u>Rita</u>, we said as much, in fairly explicit terms: "We repeat that the
> presumption before us is an appellate court presumption…[T]he
> sentencing court does not enjoy the benefit of a legal presumption
> that the Guidelines sentence should apply."  551 U.S., at 351.  And
> in <u>Gall </u> we reiterated that district judges, in considering how the
> various statutory sentencing factors apply to an individual
> defendant, "may not presume that the Guidelines range is
> reasonable."

It is submitted that the Supreme Court, in *Gall, Kimbrough, Spears and*

*Nelson, supra,* has made extra effort to tell the lower courts that they need not,

perhaps, even should not, keep gravitating toward the Guidelines.  The

Guidelines, in fact, should not be the focus, but what should be looked to is the

"overarching provision [of § 3553(a)] instructing district courts to 'impose a sentence sufficient but not greater than necessary' to achieve the goals of sentencing." *Kimbrough, supra*, at 570.  Of course, the district court must "correctly calculate" the Guidelines range, but this is only so a judge can resolve any disputes about Guidelines facts and application issues at the outset, for the Guidelines are not only not mandatory, but, as pointed out, above, courts are not to presume they apply or even are reasonable.

Judges are invited to consider arguments that any potential applicable Guideline fails to properly reflect § 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way and/or that a different sentence is appropriate regardless.  *Rita, supra,* at 2465.  District courts "…may vary [from Guidelines ranges] based solely on policy considerations, including disagreement with the Guidelines" (*Kimbrough, supra,* at 570), and, when they do, the courts of appeal may not "…grant greater fact-finding leeway to [the Sentencing Commission] than to [the] district judge." *Rita, supra,* at 2463.

Whether a judge may draw any useful advice from a Guideline depends first on whether the Sentencing Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough, supra,* at 575.  As described in *Rita*, the exercise of this role has two basic

components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data and comments from participants and experts in the field. *Rita, supra,* 2464-65. Where a Guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough, supra,* at 575. *See, also*, *Spears, supra,* at 843-844. ("We now clarify that district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on policy disagreement with those Guidelines").

The district courts' ability to impose a non-Guidelines sentence based solely on a policy disagreement with the Guideline itself applies to the whole of the Guidelines, not just the crack Guidelines. Such principle did not originate in *Kimbrough* but in language applicable to all of the Guidelines in cases preceding that case. It began in *Cunningham v. California,* 549 U.S. 270 (2007), where the Supreme Court recognized that the ability of judges to sentence outside the Guidelines range based solely on general policy objectives, without any fact-finding anchor, is necessary to avoid a Sixth Amendment violation. *Cunningham, supra, at* 279-281. Then, in *Rita*, the Court held that because the Guidelines may not be presumed reasonable at

7

sentencing, sentencing judges are permitted to find that the Guidelines
sentence itself fails properly to reflect § 3553(a) considerations, that the
Guidelines reflect unsound judgment or that the Guidelines do not generally
treat certain defendant characteristics in the proper way (*Rita,* 2465, 2468).
Finally, in *Kimbrough*, the Court reiterated that a district court may consider
arguments that "the Guidelines sentence itself fails properly to reflect §
3553(a) considerations, or, perhaps, because the case warrants a different
sentence regardless, courts may vary [from Guideline ranges] based solely on
policy considerations, including disagreements with the Guidelines."
*Kimbrough,* at 570.

       This ability to disagree as a matter of policy applies to all Guidelines,
including Guidelines that emanate from congressional actions.  *United States v.
Carr*, 557 F. 3d 93, 106 (2d Cir. 2009) (noting that "the sentencing court has
discretion to deviate from the Guidelines-recommended range based on the
court's disagreement with the policy judgments evinced in a particular
guideline"); *United States v. Cavera,* 550 F.3d 180, 191 (2d Cir. 2009); *United
States v. Seval*, Slip Op. 2008 WL 4376826 (2d Cir. Sept 25, 2008); *United
States v. Jones, 531 F.3d 163* (2d Cir. 2008) (all guidelines); *United States v.
Sanchez,* 517 F.3d 651, 662-65 (2d Cir. 2008) ("Section 994(h)…, by its terms,
is a direction to the Sentencing Commission, not to the courts"); *United States*

*v. Taylor,* 2008 WL2332314  (S.D.N.Y June 2 2008); *United States v. Parris,* 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).  *See, also, Pepper v. United States,* 562 U.S. 476, 487 (2011), quoting *Koon, supra.*  [*i.e.,* "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"].

Rarely do the Guidelines reflect the Commission's "exercise of its characteristic institutional role," referred to, *supra*.  Many Guidelines are not tied to empirical research and data from pre-Guidelines sentencing and from decisions and participants and experts in the field.  Hardly ever are they unfettered by politics.  The "idealized vision of Commission policy-making [its 'institutionalized role'] is the exception rather than the rule." Hofer, Paul J., *The Reset Solution*, 20 Fed. Sent'g. Rep., 349 (2008).  Instead, "the Guidelines mechanism often has been seized by the political branches and directed toward goals other than the purposes of sentencing." *Id.*


## HISTORY AND CHARACTERISTICS OF CHRISTOPHER SALAMONE

What follows in this part of this Memorandum is based on letters that counsel has received from more than fifty people who know Chris and on

discussions that counsel has had with a number of individuals about him.  It is also based on counsel's investigation of the case and the many hours that he personally has spent with Chris over the last year.  It is counsel's belief that the aforesaid letters are significant in opening a window to what kind of person Chris is.  Counsel is confident that this Court will read each letter carefully and give all of them due consideration and appropriate weight.

Chris, who is 37 years of age, is a hard-working, humble and unselfish person, from middle-class beginnings.  He was born in Queens, New York and is the oldest of three children (brother, Nicholas, and brother Daniel) born to his parents, Arthur Salamone and Linda Kalb.  Chris grew up in a contentious household where his parents frequently argued in front of the children. These arguments would lead to the police being called at times.  His parents divorced when Chris was 11 years old, in part as a result of his mother's extra marital affair with Anthony Viggiano. (father of defendant Anthony Viggiano) Dealing with his parents' divorce was emotionally very difficult for Christopher particularly because his mother's affair was very public and Anthony Viggiano lived on the same block as the Salamones.  Christopher was haunted by the constant teasing from other children and comments from other adults in the neighborhood.

On April 6, 2019, Christopher married Kimberly Misner.   They met through a dating website three years prior to their union.  Kimberly takes care of their two young children (Gina, age 4 and Christopher jr. age 2) and woks as a project manager at Tag Worldwide.

Christopher been a life-long resident of New York State, and from the time of his birth until 2018, he resided with his mother and siblings in Baldwin, New York.  In 2018, Chris bought his home in Long Beach with money he had saved over time.  That is the home he currently lives in with his wife and children.

As to Chris' concern for others, my interviews with individuals, as well as the letters in Exhibit A, reflect his deep commitment to family and a willingness and genuine desire to help others.  The letters reveal a person who is always there, not only for his immediate family but for his extended family, friends, co-workers and others. This includes taking on a parental role with his siblings at a very young age.  As a result of Christopher's parents getting divorced when he was eleven years old, he was forced to grow up more quickly than the average child.  He selflessly sacrificed his own childhood to help his family.  He was not only tasked with the adult responsibilities around the house but also took on the role of caretaker for his younger siblings.  This aspect of Christopher's personality is not only reflected

in the way he helped his family at such a young age but also in the things he does for others.  Many of the letters contain numerous examples of this. Several letters outline how Chris helped a friend's younger sister stricken with cerebral palsy by giving her rides, helping her get to class, and helping her feel included.  Other letters describe Chris helping friends put together a resume or helping them get a job.  Another constant theme though out all the letters is what a devoted father and husband he is.  Many of the letters describe Chris' interactions with his wife and children and how the adore him.  Chris' kindness, generosity and concern for others have been constants throughout his life.  One person I spoke with put it succinctly, noting that, "Chris is not only a role model as a family man, he has a huge heart and is always looking to help those in need."

As detailed above and in the letters submitted, Christopher is a genuinely good person and one of society's givers; he is not a taker.  He has been a positive influence in the lives of many and has made a difference for the better.  Christopher has extended himself in unique and meaningful ways; his good works not only show what a big heart he has, but of giving time, of giving of himself.  That makes his good works exceptional.

## BASES FOR VARIANCE UNDER § 3553(a)

It is respectfully submitted that the Guidelines sentence conflicts with the mandates of § 3553(a) for the following reasons:

A.  The purposes set forth in § 3553(a)(2)(A) (that is, "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense") are generally referred to collectively as "retribution."  Retributive theory considers only a defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise.  Retribution also focuses on the actor's degree of blameworthiness for past actions assessed according to the nature and seriousness of the harm caused and the degree of intent and role in the offense.  Thus, the seriousness of the offense may be lessened, for example, if the crime was victimless or nonviolent —both of which, of course, apply in the instant case.  *See,* 28 U.S.C. § 994(j) (prison is usually inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

B.  Section 3553(a)(2)(B) relates to the sentencing court taking into consideration the need for the sentence "to afford adequate deterrence to criminal conduct."  The empirical research shows no relationship between sentence length and deterrence.  The general research finding is that

deterrence works in the sense that there probably is less crime with a criminal justice system than there would be without one.  However, the question for the sentencing judge is one of marginal deterrence—that is, whether any particular quantum of punishment results in increased deterrence and, therefore, decreased crime.  There is no evidence that increases in sentence length reduce crime through deterrence.  Tonry, Michael, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006).  Further, in a study involving federal white collar offenders in the pre-Guidelines era, no difference was found between probation and imprisonment.  That is, offenders given terms of probation were no more or less likely to re-offend than those given prison sentences.  Weisburd, David, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995).  Simply, offenders are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted and do not make decisions in the manner one might expect of rational decision makers.  Incarceration is not necessary to promote general deterrence.  Christopher's experience already serves as a stark reminder to others.  Indeed, no one could reasonably look at Christopher's situation, even as it already stands, and conclude that Christopher's conduct was worth the personal anguish, the loss of his job,

family disruption and crippling financial consequences that have already

come to pass.  To the contrary, Christopher's prosecution, firing from his job

and difficult time finding a replacement to support his family, together with

the consequent adverse effects on Christopher's family, will themselves serve

as a more than sufficient deterrent to him and to others.  Further, Christpher's

history and personal characteristics, make it highly unlikely that he would

commit another crime, and, so, a sentence of imprisonment seeking to further

deter him is, respectfully, equally unnecessary.

C.  Section 3554(a)(2)(C) requires a judge to consider the sentencing

purpose based on the need to protect the public from further crimes of the

defendant.  This purpose has to do with (1) the defendant's risk of recidivism,

and (2) the danger posed by the defendant.  Christopher's risk of recidivism is

extremely low when you consider his history and characteristics.  Moreover,

Chris is 37 years old and research has shown defendants of that age exhibit

markedly lower risks of recidivism in comparison to younger defendants.

U.S.S.C., *Measuring Recidivism:  The Criminal History Computation of The

Federal Sentencing Guidelines,* at 12, 28 (2004).  Post-*Booker* courts, too, have

noted that recidivism is markedly lower for mature defendants.  *United States

v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005).

D.  Section 3553(a)(2)(D) requires a sentencing judge to consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  The matter of rehabilitation has been discussed, *infra*. Christopher, respectfully, is in need of no rehabilitation such as described in this section of the statute.

As set forth above, the Guideline's sentence in this case, most respectfully, would be excessive and contrary to law, policy and procedure which has evolved from the Supreme Court (and Second Circuit) cases cited. The determination of an appropriate sentence in this case, it is submitted, should place more emphasis on Christopher's personal history and characteristics, including, without limitation:  his very devoted and conscientious work ethic, his home and family life, especially his importance to his wife and very young children (including for emotional support, guidance and financial support) his contributions to his community, his supportive family members, his generosity and benevolence and, as well, his age, his low recidivism risk, the non-violent nature and the victimless nature of the criminal conduct.

Other factors also are submitted for the Court's consideration.  First, it is important to note that very shortly after being approached about the events

leading to his arrest, Christopher not only accepted responsibility for his actions, he provided truthful information and cooperation to the government, which led to the indictment and ultimate plea of co-defendant Anthony Viggiano.  He met with the government representatives on many different occasions.  He spent several hours at each meeting truthfully answering questions and providing information, earnestly seeking to aid their investigation of Viggiano.  Significant, too, is the fact that Christopher and Anthony share a close family tie.  Anthony is Chris' step-brother.  As a result of Christopher's cooperation, there are obvious collateral familial consequences. Further, Christopher's cooperation, surrender and plea were immediate. This may be viewed as indicative of Christopher's acceptance, repentance and remorse.

It is respectfully submitted that all of the foregoing should be given full and appropriate consideration and will justify varying downward from the Guidelines; in this case, a sentence of time served and supervised release will satisfy all requirements of a fair sentence.

While Christopher will be the first to tell the Court that he is responsible for his actions and understands that there are consequences, he already has been punished by the collateral consequences of his being prosecuted.  He and his family have been under severe stress for over a year as a direct result of

17

the prosecution herein.  Further, the defense of the charges has resulted in

significant monetary cost to Christopher.  Additionally, Christopher is an

extremely proud man who has worked hard for his family and was recently

fired from his job as a result of the conviction.  As a devoted husband and

father, this entire prosecution experience has been a tremendous

embarrassment to him.

Still another reason or justification for imposition of a sentence of time

served and supervised release may be found in the fact that, in the year since

Christopher's arrest, there has been no further incident regarding a violation

of the law, any law.  Until losing his job a couple of months ago, Christopher

had continued to work hard to support his family.  He is currently looking for

a replacement job, but has had a hard time finding one with comparable pay

based on his conviction.  He also continues to strive to help others and to

maintain his high standing in the community.

## CONCLUSION

Based upon all that has been set forth herein, including Christopher's

good deeds and good personal character, the significant emotional and

financial stress that he and his family already have experienced, the further

debilitating and destructive consequences that his wife, young children and

other family members would suffer if Christopher were to be incarcerated and

18

the other adverse collateral consequences (the loss of his job and difficulty obtaining a new job, severe familial consequences for cooperating against his step-brother), it is respectfully requested that this Court sentence Christopher to a non-Guidelines sentence of time served and supervised release.  A balancing of the applicable sentencing factors set forth in § 3553(a) demonstrates that the applicable Guidelines need not, indeed, respectfully, should not, be followed in this case.  As Justice Stevens put it, the Sentencing Commission "has not developed any standards or recommendations" for many individual characteristics, but "[t]hese are…matters that §3553(a) authorizes the sentencing judge to consider," even though they are "not ordinarily considered" under the Guidelines.  *Rita, supra,* at 2473.  (Stevens, J., concurring).

Therefore, on behalf of Chris, his wife Kimberly, his young children, and his family, it is respectfully requested that this Honorable Court impose a sentence of time served and supervised release.

Dated:  Mineola, New York 11501
        August 5, 2024

Respectfully submitted,

The Pascarella Law Firm, PLLC

By:  _____/s/_____
James Adam Pascarella (JP 1496)
*Attorneys for Defendant Christopher Salamone*
1551 Franklin Avenue
Mineola, New York 11501
Tel.:  (516) 741-FIRM (3476)
Email:  jamespascarella@pascarellalawfirm

To:

All counsel via ECF