

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*


August 13, 2024

<u>**BY ECF**</u>
The Honorable Katherine Polk Failla
United States District Judge
40 Foley Square
Southern District of New York
New York, New York 10007


Re:    <u>United States</u> v. <u>Christopher Salamone</u>, 23 Cr. 496 (KPF)

Dear Judge Failla:

      In connection with the sentencing of Christopher Salamone scheduled for August 20, 2024, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines") and 18 U.S.C. § 3553(e), to advise the Court that the defendant provided substantial assistance to the Government in this investigation. Accordingly, provided the defendant continues to comply with the terms of his cooperation agreement, the Government expects at sentencing to move for the Court to sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

**Background**

      Without question, the defendant, who conspired with his friend to trade on material non-public information, has committed serious crimes. He pleaded guilty to four counts and has taken responsibility for his multiple illegal trades. Soon after the Federal Bureau of Investigation approached him in 2023, the defendant began cooperating. At the time, no defendant had been charged. The defendant could have easily taken his chances without cooperating. But he did the opposite—he cooperated against his co-defendants, including his own stepbrother.

      The results of Salamone's cooperation have been important and impressive. The defendant's cooperation contributed to the charging and conviction of multiple participants in the insider trading scheme (and a parallel enforcement action by the Securities and Exchange Commission). All of the defendant's co-defendants pleaded guilty almost immediately after the case was charged. For all these reasons and those discussed further below, the defendant's cooperation is fairly placed described as substantial and important.

    1.  **The Defendant and His Crimes**

      From at least July 2021 through May 2023, Anthony Viggiano, Stephen Forlano, Jr., and Christopher Salamone engaged in insider trading by trading on material, non-public information

that Viggiano misappropriated while employed by Blackstone, a global investment management firm ("Firm-1"), and Goldman Sachs, a global investment bank ("Firm-2"). Viggiano received confidential internal communications that contained detailed information regarding non-public potential strategic partnerships involving Firm-1 and acquisitions involving Firm-2. In violation of his employment duties to Firm-1 and Firm-2, Viggiano provided material, non-public information to Forlano, a friend he had met in college, and Salamone, who was the son of Viggiano's father's girlfriend.

Forlano and Salamone each used the material, non-public information they received from Viggiano to purchase shares in companies and to trade call options, including short dated, out-of-the-money call options. Viggiano and Salamone agreed to split the profits from their insider trading scheme, which yielded total illegal profits of over approximately $300,000. Forlano's trading activities yielded illegal profits of least approximately $100,000 from the insider trading scheme. Forlano further provided the material, non-public information he had received from Viggiano to his friends and family, including Nathan Bleckley.

During the relevant period, Firm-1 was headquartered in Manhattan. Between April 2021 and October 2021, Viggiano was employed as an analyst by Firm-1 at their Manhattan office. During the relevant period, Firm-1's compliance training instructed employees, among other things, not to "[d]iscuss/disseminate information about deals/projects you or any other [Firm-1] employee may currently be working on." Firm-1 provided specific training on material, non-public information, which stated, among other things, "trading based on MNPI [material, non-public information] is unlawful and may result in civil and criminal charges with serious penalties." In bold letters, the training stated, "You cannot trade, recommend or disclose MNPI to others who might trade on the information." The Firm-1 employee handbook also provided that confidential information was a "valuable asset of [Firm-1]" and that there was a Firm-1 policy against insider trading.

During the relevant period, Firm-2 furnished a range of financial services in the investment banking, securities, and investment management industries, and Firm-2 was headquartered in Manhattan. Between February 2022 and May 2023, Viggiano was employed as an associate in the Firm-2's asset management department at their headquarters in Manhattan. During the relevant period, Firm-2 provided annual compliance trainings, including Firm-2's policies and procedures prohibiting insider trading. As an example, Firm-2's policies prohibited employees from "Trading by Personal Accounts in any Financial Instrument or company where the [employee] has knowledge that the Financial Instrument is under consideration for purchase or sale for any [client portfolio]."

Between July 2021 and May 2023, Viggiano and Forlano agreed to, and engaged in, insider trading activities. During this time period, Viggiano provided material, non-public information to Forlano regarding strategic financial partnerships involving Firm-1 and potential acquisitions involving Firm-2. Viggiano passed this information to Forlano, at different times, over encrypted messaging applications and a video game console's communication platform. Forlano then used the material, non-public information he received from Viggiano to conduct trades in his brokerage accounts, sometimes through the purchase of call options that became profitable when the price of the relevant target company increased, and by passing the information to his family and friends.

Hon. Katherine Polk Failla                                                                    Page 3
August 13, 2024

On July 14, 2021, AIG and Firm-1 announced that Firm-1 was acquiring an equity stake in AIG's Life & Retirement business for $2.2 billion. Prior to this public announcement, Viggiano, having learned about the acquisition through his employment with Firm-1, provided the material, non-public information regarding the AIG acquisition to Forlano. Forlano, in turn, provided the material, non-public information concerning the AIG acquisition to Bleckley so that Bleckley could place trades in AIG shares, which became profitable after Firm-1's public announcement. Bleckley did not purchase any AIG shares, but, after the acquisition announcement, Forlano texted Bleckley that, "I didn[']t wanna leave a trail but rigatoni literally works for [Firm-1]." "Rigatoni" was a reference to Viggiano, who was known to Forlano and Bleckley by that nickname. Bleckley and Forlano then agreed that they would text the word "mallard" whenever Forlano was communicating insider trading tips from Viggiano. Forlano texted Bleckley, "next one i got you'll be the first to know."

On July 27, 2021, Viggiano received an email on his Firm-1 email account alerting him to an investment that Firm-1 was working on regarding Harmony. Specifically, this email noted that the investment project had a due date of August 2, 2021. Viggiano provided the material, non-public information to Forlano, and on July 27, 2021, Forlano texted and Bleckley encouraged him to buy Harmony shares by August 2, 2021. Forlano also texted Bleckley that Bleckley was free to "spread it around it just shouldn[']t be coming from me lmfao ["laughing my fucking ass off"]." Forlano then texted Bleckley, "a catalyst is coming next week." Following these messages, Forlano and Bleckley started a group text chain with several individuals, in which they encouraged the individuals on the group text to buy Harmony shares. In one text, Forlano wrote, "im only gunna [*sic*] say this 1 time…harmony biosciences buy…before next week…u didn[']t hear from me." Forlano and Bleckley each purchased Harmony shares on or before August 9, 2021. On August 10, 2021, Harmony announced a strategic financing collaboration with Firm-1.

Viggiano ceased his employment with Firm-1 in October 2021. In February 2022, Viggiano began working for Firm-2, and he continued to provide material, non-public information that he acquired through his work at Firm-2 to Forlano. On August 8, 2022, Viggiano received a message on his Firm-2 email account alerting him to a potential acquisition of ChannelAdvisor by CommerceHub. Viggiano furnished this information to Forlano. Forlano then sent Bleckley disappearing messages, via Instagram, informing Bleckley to communicate with him via a videogame console's audio chat. Using this videogame audio chat, Forlano told Bleckley that ChannelAdvisor was going to be acquired by CommerceHub, along with target price per share.

On March 29, 2022, Viggiano received an email on his Firm-2 email account regarding Firm-2's involvement in Brookfield's bid to acquire CDK Global. Viggiano passed this material, non-public information along to Salamone. On April 4, 2022, Salamone purchased approximately 40 CDK shares based on the material, non-public information he received from Viggiano. On April 7, 2022, Brookfield publicly announced that it had entered into an agreement to acquire CDK Global. On April 8, 2022, Salamone sold his CDK shares for a profit of approximately $206.40.

On August 9, 2022, Viggiano received an email on his Firm-2 email account concerning Firm-2's involvement in Centerbridge Partners' acquisition of Computer Services, Inc. Viggiano provided this material, non-public information to Salamone. On August 19, 2022, Salamone purchased 135 CSVI shares for $37.75 per share. On Monday, August 22, 2022, Computer Services issued a press release announcing a definitive agreement for Centerbridge and Bridgeport

Hon. Katherine Polk Failla                                                                                  Page 4
August 13, 2024

Partners to acquire Computer Services at $58.00 per share. On August 22, 2022, Salamone sold his CSVI shares for a profit of approximately $2,530.66.

Following Salamone's trades in CDK and CSVI, Viggiano explained to Salamone that Viggiano was not allowed to personally trade in any securities because of Viggiano's employment with Firm-2. Viggiano and Salamone subsequently agreed that Salamone would conduct securities trade based on material, non-public information provided by Viggiano, with the two splitting any profits from the insider trading activities. Viggiano also furnished Salamone with approximately $10,000 in cash to deposit into Salamone's brokerage account, which Salamone matched with his own funds.

From August 2022 to September 2, 2022, Salamone started purchasing ECOM shares based on the material, non-public information obtained from Viggiano. On Friday, September 2, 2022, ECOM shares closed at $14.70. On Tuesday, September 6, 2022, following the Labor Day weekend, ChannelAdvisor and CommerceHub publicly announced their agreement for CommerceHub to acquire ChannelAdvisor at $23.10 per share. After this public announcement, Salamone sold his ECOM shares for a total profit of approximately $12,000.

Following the ECOM trade, Viggiano instructed Salamone to apply for options trading on Salamone's brokerage account. On December 15, 2022, Viggiano and Salamone met in person in order for Viggiano to assist Salamone in acquiring call option contracts in Maxar on Salamone's brokerage account, via a mobile application on Salamone's cell phone, based on the material, non-public information Viggiano had received from Firm-2 in November 2022. While executing these purchases, Viggiano informed Salamone that Viggiano was purchasing shares in other companies in the similar field as Maxar, via Salamone brokerage account, as a "smokescreen" in case Salamone or Viggiano were asked about the trading activities in Maxar in Salamone's brokerage account. Viggiano physically entered the trades on Salamone's phone.

At the close of trading on December 15, 2022, MAXR shares were priced at $23.10. On December 16, 2022, Maxar and Advent International publicly announced an agreement for Advent International to acquire Maxar at $53.00 per share. Following this announcement, Salamone sold his call options in Maxar for a total profit of approximately $280,000. Viggiano informed Salamone that he knew the Maxar acquisition announcement was coming because everyone at Firm-2 was trying to get the acquisition deal done prior to the end of 2022.

Following the announcement of the Maxar acquisition, Salamone provided Viggiano, with approximately $35,000 in cash, pursuant to their agreement. Viggiano and Salamone subsequently attempted to set up a securities trading company in Dubai, United Arab Emirates, in order to defer paying capital gains taxes on the profits from their insider trading scheme. Viggiano initially contacted the company in Dubai using and requested a proposal in Salamone's name. No account was set up for a securities trading company.

On January 20, 2023, Viggiano received an email at his Firm-2 email address alerting him to Firm-2 providing financing to transition Atlas Technical Consultants from a publicly traded company to a privately held company. Afterwards, Viggiano provided this material, non-public information to Salamone so he could purchase ATCX shares. On January 24, 2023, January 25, 2023, and January 27, 2023, Salamone purchased approximately 3,500 ATCX shares. On January

31, 2023, GI Partners announced its intention to acquire Atlas at $12.25 per share. Following this announcement on January 31, 2023, Salamone sold his ATCX shares for a total profit of approximately $22,993

On February 18, 2023, Viggiano received an email at his Firm-2 email account alerting him to Firm-2 working on financing to support the transition of Syneos Health from a publicly traded company to a privately held company. Afterwards, Viggiano furnished this material, non-public information to Salamone. On February 24, 2023, Salamone purchased call option contracts for Syneos that expired on March 17, 2023, based on the information he had received from Viggiano. However, the Syneos transition from public to private company was not publicly announced until on May 10, 2023, and as a result, the call options purchased by Salamone expired, with Salamone sustaining a loss.

In June 2023, FBI agents visited and interviewed Viggiano and Salamone. After those interviews, Viggiano made the following statements to Salamone that, unbeknownst to Viggiano, was recorded by Salamone:

> **VIGGIANO**: "You have both the people here who executed trades, fucking, you have all that. What you're missing is the fucking dots. Right? They have – they have me at [Firm-2] having access to this information, and the over here is…trading that loosely connects to me. It doesn't take a brain surgeon. So, what – what's more valuable? If I were to flip, or if Steve [FORLANO] flipped. If Steve flipped, it's a he said, she said bullshit. Because if – it was right now. If I flip, this whole thing's done, this case is closed, and they're like, yeah."
> Salamone: "You have shit where you're giving fucking information to fucking Steve [FORLANO]?
>
> **VIGGIANO**: "Nah. Nah. Because similar to you…signal, or like XBOX 360 chat, there's no tracing that. Good luck ever finding that. So, I mean, at worst – we're talking worst-case scenario, maybe I said something in…like the very first one. But that's the worst case."

## 2. The Defendant's Cooperation

The defendant's cooperation began in 2023, almost immediately after the FBI approached him. At that point, Salamone informed law enforcement about the insider trading activities involving Viggiano and provided the Government with the recording he made and described above. In reliance on, among other things, the defendant's cooperation, the Government obtained indictments in this case, which contained the full scope of Viggiano's scheme. The Government ultimately charged and convicted each of these defendants. The defendant's information was critical to the Government's anticipated ability to prove its case against Viggiano and Forlano and directly led to their swift guilty pleas.

### Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant

who has rendered substantial assistance. *See* U.S.S.G. §5K1.1(a). The application of each of those factors to the defendant's cooperation is set forth below.

### 1. "[S]ignificance and usefulness of the defendant's assistance" (§5K1.1(a)(1))

The significance and usefulness of the defendant's assistance cannot be overstated. Simply put, Salamone's cooperation was essential to charging and convicting Forlano and Viggiano. There is no doubt that this case against these defendants would have been far more difficult to bring without the defendant. The challenges that this investigation further highlight the significance and usefulness of the defendant's cooperation. Viggiano primarily used encrypted messaging to pass his tips and did in-person meetings with Salamone to implement the trading strategies. Viggiano also purchased "smoke screen" stocks to further hide the scheme. A cooperator who could provide direct evidence of the crime was therefore a an extremely consequential factor in the Government's ability to prosecute Salamone's co-conspirators.

The defendant was able to provide first-hand knowledge of Viggiano's scheme and, of course, the recording provided devastating evidence of Viggiano's guilt. Further, Salamone alerted the Government to Viggiano's plans to start a trading company in Salamone's name and therefore provided an additional swath of evidence of the conspiracy that was otherwise unknown to law enforcement. Additionally, the defendant was prepared to testify against each of these defendants. Although he was not ultimately required to provide such testimony because his co-conspirators pled guilty, Salamone would have been a critical witness against them.

### 2. "[T]ruthfulness, completeness, and reliability" of the defendant's information and testimony (§5K1.1(a)(2))

The defendant has been truthful with the Government from the outset of his cooperation. The information he has provided has been complete, reliable, and corroborated by other evidence developed during the investigation, including information provided by other witnesses. The defendant also fully disclosed every prior bad act he committed including overstating losses in his tax returns, shoplifting, and person use of drugs.

### 3. "[N]ature and extent of the defendant's assistance" (§5K1.1(a)(3))

Like almost all defendants who receive a 5K letter, the defendant attended many meetings with law enforcement and the Government in which he truthfully discussed crimes he and others had committed. He pleaded guilty to an information and was prepared to testify against the co-defendants if the case went to trial.

### 4. "[I]njury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance" (§5K1.1(a)(4))

Although there is no risk of danger as a result of his cooperation, Salamone's cooperation was sensitive because he cooperated against his own family member.

**5.  "[T]imeliness of the defendant's assistance" (§5K1.1(a)(5))**

The defendant's cooperation was timely. The defendant began cooperating after he was approached by the FBI. Once he began meeting with prosecutors, the defendant immediately provided reliable, timely assistance.  Indeed, his cooperation began before any other defendant was charged.  Salamone pleaded guilty to an information before any of his co-defendants were charged.

## Conclusion

In light of the facts set forth above, and assuming that the defendant continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence the defendant in light of the factors set forth in Section 5K1.1 of the Guidelines, pursuant to 18 U.S.C. § 3553(e).

In addition, the Government recommends that the Court impose a forfeiture order of $307,239 and a special assessment of $400.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s_____
Peter J. Davis
Jared Lenow
Assistant United States Attorneys
Telephone:  (212) 637-2468

cc:      Counsel for Christopher Salamone
United States Probation Officer